Filed 1/26/26  In re Esteban R.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re ESTEBAN R.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | D085413 |
| Plaintiff and Respondent, | (Super. Ct. No. J244259) |
| v. | |
| ESTEBAN R.S., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

Heather E. Shallenberger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski, and Flavio Nominati, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Esteban R.S. appeals an order transferring him from the juvenile court to a court of criminal jurisdiction under Welfare and Institutions Code section 707.[1]  He asserts the People failed to show he could not be rehabilitated in a Secure Youth Treatment Facility (SYTF) before the juvenile court's jurisdiction expired and, thus, the court abused its discretion when it granted the transfer order.  Because we conclude the court's findings are supported by substantial evidence, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Esteban's Past Adjudications*

Prior to the charged offenses, when Esteban was 15 years old, police officers responded to a report that six males were vandalizing an alley with paint.  The officers found Esteban and five other juveniles surrounded by gang graffiti.  Esteban attempted to flee the area, but the officers stopped him.  Within his discarded backpack, an officer found a loaded revolver, five ammunition rounds, and six rolled marijuana cigarettes.  The officers arrested him for possession of a firearm, ammunition, and marijuana, as well as vandalism over $400 and resisting an officer.  Esteban admitted it was true he possessed a firearm, and the remaining charges were dismissed.  The juvenile court adjudged him a ward of the court.

Following several probation violations and intervention attempts, the court committed Esteban to Urban Camp.  It was there, when he was 16 years old, that Esteban punched another youth in the face 11 times, without

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

2

provocation.  This incident led to a true finding for assault with a means likely to produce great bodily injury.

## II.

### *Charged Offenses*

Twenty-two days after Esteban's release from Urban Camp and while he was still 16 years old, the People filed a section 602 petition, alleging he attempted to murder another youth, named E.C., for the benefit of a criminal street gang and, in doing so, he intentionally and personally discharged a firearm causing great bodily injury.  (Pen. Code, §§ 664/187, subd. (a), 186.22, subd. (b)(1), 12022.53, subd. (d).)  The People also alleged he assaulted E.C. and another youth, M.C., with a semi-automatic firearm, along with a personal use of a firearm, gang, and great bodily injury enhancements.  (Pen. Code, §§ 245, subd. (b), 12022.5, subd. (a)(1), 186.22, subd. (b)(1), 12022.7, subd. (a).)  Lastly, the People alleged he unlawfully possessed a firearm and ammunition.  (Pen. Code, §§ 29800, subd. (a)(1), 30305, subd. (a).)

E.C. and M.C. attended a party.[2]  E.C. was in a gang and wore a red jacket with his identifying gang moniker on it.  When E.C. and M.C. left the party, two males were standing across the street.  One of the males ran towards them, shouting "Fuck Southeast" in reference to E.C.'s gang.  The male shot E.C. five times before fleeing the scene.

After the shooting, E.C.'s relative received messages from a social media account that is known to belong to Esteban.  The messages included asking, "How's [E.C.] (with a smiling/laughing emoji face)" and a picture of

---

[2]    As the parties do, we derive the facts from the Probation Department's transfer report filed in connection with the People's motion to transfer the matter to a court of criminal jurisdiction.

3

E.C.'s back while he wore his red jacket, with an explosion imposed on the image and a song that included the lyrics "your [dead] homie."

A detective reviewed Esteban's social media account and cellphone, finding several messages related to the shooting. One of Esteban's messages said, "All I said was fuck southeast n lit bluhd up." Another said, "[you know] whats crazy foo [E.C.] saw me n [just] let me walk behind him." When the recipient of the message replied, "You got the homie from the back," Esteban's responses included, "Hella did, tell him to look around foo," "easy ass walk up," "Easiest skit," "[everyone] there knew we were there," and "He fucked up bad by letting me walk past em." Esteban also told members of his gang to talk about the shooting, saying "[he] need[ed] another tat." The day after the shooting, Esteban questioned if E.C. died, wanting confirmation "[b]efore I get shit tatted." When Esteban learned E.C. had survived, he responded, "BROOO WHATTTTT," "fuckkkkkkkk," "Bluhd made it." He then sent sad face emojis.

Detectives searched Esteban's room and found a handgun wrapped in a sock inside Esteban's laundry basket in his closet, along with a high-capacity magazine loaded with 9mm ammunition.

III.

*Motion To Transfer*

The People filed a motion to transfer Esteban from juvenile court to a court of criminal jurisdiction.

Pursuant to section 707, the Probation Department filed a 49-page transfer report addressing Esteban's amenability for rehabilitation under the juvenile court's jurisdiction. This report detailed Esteban's history of delinquency, individual and family history, prior probation interventions, the circumstances of the alleged offenses, a psychologist's recommendations for

4

rehabilitative services, and a summary of the services available in the HOPE and SYTF programs.

At the transfer motion hearing, an expert witness testified for the defense and opined that Esteban was amenable to rehabilitation in the juvenile justice system.  After considering the expert's testimony and the evidence presented regarding Esteban's past, the circumstances of the current allegations, and Esteban's progress in custody while pending the hearing, the court ordered Esteban's transfer to criminal court pursuant to section 707.  Within the 13-page written order, the court detailed the basis for its decision as to each criterion and concluded that it found "by clear and convincing evidence . . . [Esteban] is not amenable to rehabilitation while under the jurisdiction of the juvenile court."

## DISCUSSION

## I.

### *Legal Framework*

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court.  It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).)  The prosecution bears the burden of proving that the minor should be transferred.  (Cal. Rules of Court, rule 5.770(a).)"  (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

"In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (§ 707, subd. (a)(3).)  "[C]lear and convincing evidence demands a degree of certainty greater than that involved with the

preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998.) The evidence must "leave no substantial doubt." (*In re Terry D.* (1978) 83 Cal.App.3d 890, 899.)

In making that determination, the court must consider five criteria: (1) the degree of criminal sophistication exhibited by the minor; (2) whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction;[3] (3) the minor's previous delinquent history; (4) success of previous attempts to rehabilitate the minor; and (5) the circumstances and gravity of the offense alleged in the petition to have been committed by the minor. (§ 707, subd. (a)(3)(A)–(E).) The weight given to each of the criteria is within the court's discretion. (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186 (*Kevin P.*).)

"A minor . . . is not required to establish innocence in order to show amenability to the juvenile court system." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 682.) Instead, "the criteria . . . are based on the premise that the minor did, in fact, commit the offense" (*ibid.*), and the purpose is to determine whether the minor would nonetheless be amenable to treatment under the jurisdiction of the juvenile court (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 186). If the court decides to order a transfer of jurisdiction, it must recite the basis for its decision and include the reasons it found the minor was not amenable to rehabilitation under the juvenile court's jurisdiction. (§ 707, subd. (a)(3).)

---

3    While the second criterion sounds similar, it is distinguishable from the ultimate determination that the court must make (whether the minor is amenable to rehabilitation while under juvenile court jurisdiction). (*Miguel R., supra*, 100 Cal.App.5th at pp. 167–168.)

6

We review the juvenile court's order for abuse of discretion. (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) " 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' " (*Ibid.*) The court's findings as to each of the specified criterion and its ultimate finding " 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court' " are findings of fact reviewed for substantial evidence. (*Ibid.*) However, "we do not reweigh the evidence and we do not substitute our discretion for the discretion exercised by the trial court." (*In re J.S.* (2024) 105 Cal.App.5th 205, 211.)

II.

*Sufficiency of the Evidence*

We conclude the juvenile court's findings as to each of the statutory criterion and its ultimate conclusion are supported by substantial evidence.

A.    *Criminal Sophistication*

When evaluating the degree of criminal sophistication exhibited by the minor, the court was required to " 'consider the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime.' " (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 192.) Factors for consideration include, but are not limited to, "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions;

7

the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).) Positive factors such as normal intellectual capacity "do not affirmatively demonstrate criminal sophistication," but they can support transfer "to the extent [the positive factors] fail to mitigate other evidence that does affirmatively demonstrate criminal sophistication." (*Kevin P.*, at p. 193.)

Esteban witnessed his father's alcoholism and abusive behavior towards others but idolized him. His father "presented himself in a 'gangster' and 'tough' manner," and he was incarcerated for drug-related offenses around the time Esteban was eight years old. After his father's incarceration, Esteban went to counseling, and he continued to perform well in school. But by age 11, Esteban started using alcohol " 'almost daily.' " Esteban transitioned to a new school at 12 years old, where his behavior, scores, and attendance worsened. Esteban's mother opined the recent loss of his paternal grandmother, her own absence due to work commitments, and the family's frequent relocations were harmful to Esteban. He began associating with the " 'wrong crowd' " and not going to school. By age 13, he started using marijuana, and at 14, he joined a gang. At 15, he used cocaine "twice." And by 16 (five months before the charged offenses), he had been shot in the leg in a gang-altercation.

The court considered Esteban's age, substance use, and past trauma, and determined "[w]hile these circumstances no doubt contributed to Esteban's personality, functioning, and emotional well-being, and may provide insight as to why Esteban was attracted to the gang life," these

8

factors do not mitigate that he is criminally sophisticated. It found Esteban's "high degree of criminal sophistication . . . is evidenced in part from the offense that brought him before the court, his conduct while detained, and his conduct while out in the community." The court considered but rejected the defense expert's opinion that this criterion did not weigh in favor of transfer to criminal court. The court explained in its ruling that it was not persuaded by the defense expert, "in part, because of [the expert's] interpretation of the evidence as to the alleged offense, which formed a basis for her opinion."

As the trier of fact, the court was free to discredit the expert witness's testimony (*In re J.S., supra,* 105 Cal.App.5th at p. 212), and we must give due deference to that determination (*Conservatorship of O.B.*, *supra,* 9 Cal. 5th at p. 996.) We conclude that the court's finding is supported by substantial evidence.

Before the alleged offenses, Esteban knew he was on probation and there are consequences to violations, including increased time in custody. Esteban was very familiar with the juvenile justice system. He discussed among his peers the different judges in the juvenile court, varying dispositions that could come from the court, and the fact that he needed his misconduct to go undetected while he remained on probation. Before the shooting, Esteban explained in social media messages with others he was pretending to be good so he could get off probation and "move back to the hood." He stated he knew probation was "about to hit his house" and he "stashed" his firearm to avoid detection. He also had conversations with other individuals about deleting their social media accounts to avoid review by probation and how to avoid detection of drug use in a drug test.

Esteban admitted he was the actual shooter. He was neither provoked nor acting in the heat of passion or in self-defense. By his own words, he

9

intended to kill the victim so he could "earn[ ]" a tattoo. A gang detective testified that getting a tattoo after having shot or killed someone is significant in that it is done to get "recognition within the gang." And while the defense expert opined that bragging about the shooting after the fact did not demonstrate criminal sophistication, the gang detective testified this type of bragging is common in juvenile and adult gang members and is meant to "show that they are higher ups, that they're doing work."

We conclude there is substantial evidence from which a reasonable trier of fact could find Esteban's criminal sophistication weighed in favor of his transfer to adult court.

B.     *Potential for Rehabilitation During Remaining Juvenile Jurisdiction*

When evaluating whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction, the "court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).)

Esteban was 17 years and 10 months old at the time of the transfer hearing. The court correctly noted that if Esteban was not transferred to the criminal court, the juvenile court would have jurisdiction over Esteban until he reached the age of 25. (§§ 607, subd. (c), 707, subd. (b)(12), (14), 1769, subd. (b).) The court determined this criterion weighed in favor of transfer because Esteban "has learned to perform within the structure of the court's rehabilitative custodial programs, in order to successfully complete the programs and return to the community," where he then immediately reverts to negative behavior.

Esteban contends he can be rehabilitated within the time remaining for juvenile jurisdiction because during the time leading up to his transfer hearing, he showed maturation "by refraining from assaultive behavior,

10

programming as expected, and disengaging completely from all gang associations." He asserts the court's determination to the contrary is a result of the court's "cynicism," and his improvement in custody while pending the transfer hearing demonstrated "real—as opposed to superficial—change[ ]." This argument fails to persuade us because it asks us to substitute our discretion and improperly reweigh the evidence by giving more weight to the progress Esteban has made while pending the transfer hearing. (See *In re J.S.*, *supra*, 105 Cal.App.5th at p. 211.)

Esteban asserts the evidence is insufficient relying on *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706 (*J.N.*), and *Kevin P., supra,* 57 Cal.App.5th 173. He argues these cases hold that for there to be substantial evidence, "there must be 'expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the minor] before termination of the juvenile court's jurisdiction.' " According to Esteban, the "record contains no such evidence." But neither section 707 nor these cases hold that expert testimony is required, and Esteban fails to appreciate the contextual differences present in *J.N.* and *Kevin P.*

Section 707, subdivision (a)(2), provides that after the petitioner moves to transfer the individual to a court of criminal jurisdiction, "the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the individual." Section 707, subdivision (a)(3), adds the court must consider this report and "any other relevant evidence that the petitioner or the minor may wish to submit." Nothing in section 707 *requires* either party to submit expert testimony.

In *J.N.*, the Court of Appeal explained experts "may testify on the issue of the availability of treatment programs in the juvenile court system and the

11

amenability of the minor to those programs.  In those cases where the juvenile court might decide treatment as a juvenile would be in the minor's best interest, the court could still find the minor unfit *if* those experts testified that rehabilitation might require treatment beyond the date of his mandatory discharge." (*J.N.*, *supra*, 23 Cal.App.5th at pp. 721–722 [cleaned up].)  This portion of *J.N.* quotes from *Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709 (*Jimmy H.*).  In *Jimmy H.*, the Supreme Court explained if the time required for rehabilitation "is the determinative factor in the court's decision . . . there must be substantial evidence in the record that successful treatment might require the extra time." (*Jimmy H.*, at p. 715.)  But in doing so, it did not provide that expert testimony was the only means to provide such evidence, explaining courts "may consider a minor's past record of delinquency . . . and *must* take into account his behavior pattern as described in the probation officer's report," and expert witnesses may provide guidance for the court's decision.  (*Id.* at p. 714 [cleaned up].)  And in *J.N.*, the reason the evidence was insufficient is because it was based solely on the probation officer's unsupported conclusion, which included no evidence of why the minor was unlikely to be rehabilitated in the juvenile system.  (*J.N.*, at pp. 721–722.)

In *Kevin P.*, the Court of Appeal rejected a probation officer's assessment that the second criterion weighed in favor of transfer because that analysis "was based on nothing specific about [the minor] except 'the circumstances of the current offense.'" (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 200.)  *Kevin P.* affirmed that "while the circumstances of an offense are key to evaluating section 707's gravity criterion, they cannot be the sole basis for concluding under the rehabilitation criterion that the minor is unlikely to be rehabilitated before juvenile jurisdiction expires." (*Id.* at p. 201.)

Here, unlike *J.N.* and *Kevin P.*, the court did not rely on the gravity of the offense alone and it had specific evidence that Esteban was unlikely to be rehabilitated while under the juvenile court's jurisdiction. Esteban had previously shown maturation and growth in the juvenile court system, receiving positive reviews in custody and earning early release from his custodial commitment. But within days of being released from custody he was bragging about possessing a weapon and successfully hiding it from probation, and within 22 days, he committed the charged offenses. None of the services that Esteban received in confinement stopped this, and if Esteban were to remain under the juvenile court's jurisdiction, the services available would largely be the same as the services he already completed and earned early release from.

When Esteban was previously committed to Urban Camp, his main challenges were deemed to be "violent behavior, substance use, and gang affiliation." There, he worked directly with the alcohol and drug program specialist, engaged in individual counseling, family therapy, group therapy, and other programs (including Life Skill and Project AWARE) targeted at education, social skill development, empathy, problem-solving skills, building self-esteem, anti-gang violence, and peer support. He was released early from his 250-day Urban Camp commitment because his performance was "commendable." He he had volunteered to facilitate a session in his substance use disorder group, his average behavior was rated as an " 'A,' " and his mental health clinician " '[did] not see him needing much re-direction. . . . He [was] engaged and open in sessions and [sought] out support when needed.' "

After Esteban shot E.C., a psychologist evaluated him and determined he had a " 'Moderate' risk rating for future violence, with concerns related to

13

violence, probation violations, home violence exposure, gang association, and impulsive behaviors." The psychologist recommended "a residential inpatient setting for at least three months to provide the necessary structure, supervision, and access to therapeutic services." The psychologist determined this should include individual therapy, family therapy, group therapy, social skills development, vocational training, and psychiatric medication evaluation (to assess the effectiveness of his current medication treatments). He opined the therapy should focus on, among other things, problem-solving skills, substance abuse treatment, and social skills development to help Esteban improve his self-esteem. The defense expert's opinion aligned with the psychologist's recommendation, including that Esteban should receive vocational, educational, and prosocial programming. The defense expert also believed Esteban had received only substance abuse education classes in the past and opined he would benefit from more extensive substance abuse treatment.

However, Esteban had received more extensive substance abuse treatment. Before the charged offenses, he met with a drug and alcohol program specialist one to two times a week during his custodial commitment. And while the psychologist recommended a residential inpatient setting to provide "structure, supervision, and access to therapeutic services" for at least three months, this course of intervention had already been attempted as well. The juvenile court previously committed Esteban to Urban Camp for a period of more than three months. There, he received structure, supervision, and access to therapeutic services, focusing on the very same concerns that the psychologist had identified. A SYTF would provide similar services to Urban Camp, "including Cognitive Behavioral Therapy (CBT), academic support, individual and family therapy, gang intervention through Project

14

AWARE, . . . music production through David's Harp Foundation," and "college programs, vocational training, and journaling."

Therefore, even considering Esteban's progress in custody following his arrest for the charged offenses and leading up to the transfer hearing (where he was again excelling in the services provided), the court had substantial evidence from which it could determine this criterion weighed in favor of transfer. Esteban had "learned to perform within the structure of the court's rehabilitative custodial programs," performing so exceptionally that he earned early release, yet none of it was effective when Esteban left custody and reentered the community. The court knew what Esteban needed, and the juvenile court provided for those needs during lengthy custodial commitments to no avail. Six minutes before the shooting, Esteban had been in contact with his mother, and he had a rideshare company en route to pick him up. He could have chosen to leave and not commit the alleged violent, life-endangering, offenses and none of the services he received—and excelled in—stopped him. Thus, a reasonable trier of fact could conclude this criterion weighed in favor of transfer because Esteban's needs were unlikely to be met at a SYTF where potentially more intensive but similar interventions would be employed in the time remaining.

C.    *Previous Delinquent History*

When evaluating a minor's previous delinquent history, the "court shall give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C)(ii).)

Here, the court found Esteban's history of delinquency weighed in favor of transfer because he progressed "from engaging in [the] non-violent, albeit

15

dangerous gang activity, of possessing a firearm and vandalizing the community, to assault with force likely to produce great bodily injury, to now attempted murder with a firearm for the benefit of his gang." The court considered Esteban's delinquent history in light of his family and community environment, and childhood trauma. The court determined that while these factors provide context for Esteban's behavior, they "[do] not mitigate the actual delinquent history." We conclude the court's finding is supported by substantial evidence. While Esteban faced difficulties as a child, a reasonable trier of fact could conclude that those difficulties do not mitigate Esteban's increasing misconduct, given the positive factors that were also in his life.

Esteban has a supportive family "with positive influences from family members, including his mother, stepfather, maternal grandmother, and maternal aunt." While Esteban's father was absent from his life, Esteban's stepfather "effectively assumed [the] role [of a parent], developing a particularly close relationship with Esteban." And his mother, stepfather, and maternal grandmother were actively invested in Esteban's success, to include moving to a new area to distance Esteban from negative peer influences.

Despite the positive influences in his life, Esteban's misconduct only escalated in severity with time. When Esteban was 15 years old, he was found wearing gang-related clothing near recently painted gang-graffiti, and he had a loaded firearm and marijuana in his backpack. Esteban was placed on probation but ran away from home, associated with gang members, and was expelled from school for fighting with six other juveniles. Esteban was given a chance to remain with his mother rather than being committed to Urban Camp, and he ran away again with his whereabouts unknown for over

16

a month. When Esteban was found, arrested, and was awaiting his probation violation hearing, he engaged in in two gang-related fights. The court committed Esteban to Urban Camp for 130-days, which he successfully completed. But then once released, he ran away from home again, obtained a large gang tattoo, and was shot in the leg in a gang-related altercation. In his resulting Urban Camp commitment for 250-days, he then participated in a riot, and engaged in multiple fights, to include punching another youth in the face 11 times without provocation. Following the unprovoked assault, the court gave Esteban the opportunity to complete his 250-day commitment to Urban Camp. Given that opportunity, Esteban altered his behavior at Urban Camp and through his demonstrated behavioral improvements and participation in intensive family therapy, he earned his early release.

But once he was released, he committed the charged offenses, and while pending his transfer hearing, he was involved in seven violent incidents while in custody. Given the severity of his delinquent history, there is substantial evidence from which a reasonable trier of fact could conclude that this criterion weighs in favor of transfer.

D.    *Previous Rehabilitation*

When evaluating the minor's previous rehabilitation, the "court shall give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (§ 707, subd. (a)(3)(D)(ii).) The court found this criterion weighed in favor of transfer. The court heard arguments regarding the adequacy of the previous services provided to Esteban and found, contrary to the defense expert's opinion, Esteban was provided adequate services to address his needs. This finding is also supported by substantial evidence.

Esteban was provided extensive rehabilitative services in the

17

community and in custody that were tailored to his specific identified needs. Early on, the probation department assessed Esteban's needs and employed services directed to his specific needs with the cooperation of Esteban's mother, including education, individual therapy, family therapy, and group therapy, focused on behavior, substance abuse, problem solving, social development skills, and gang intervention  These services increased as Esteban's misconduct persisted.

Probation addressed Esteban's substance use first through substance abuse groups in the Alternatives to Detention (ATD) program, then he was referred to Substance Abuse Services.  Esteban worked with an Alcohol and Drug Program Specialist one to two times a week and participated in groups focused on substance use.  In the ATD program, he also began a three-month individual counseling program focused on better decision-making.  Following this program, probation increased Esteban's number of counseling sessions and provided for his one-on-one counseling both in custody and in the community, and his counseling evolved to address his violent behavior and trauma.  Esteban and his mother were also provided continuous family counseling.  He also attended group sessions, workshops, and programs addressing gang violence and life skills.

Esteban received mentoring and academic support from the CHOICE program over the course of a year, both in and out of custody, completing classwork while in custody and independent study after his release from custody, while Probation monitored his grades.  In the CHOICE program, he received "intensive support through daily contacts, . . . home and school visits, community outings, recreational activities, and incentives to deter gang involvement and prevent recidivism."

Because the services were tailored to meet Esteban's specific needs and were provided both in and out of custody to facilitate continued progress in the community, there is substantial evidence from which a reasonable trier of fact could conclude that Esteban received adequate services. Yet, despite the adequacy of the services, Esteban reverted to criminal activity. Thus, a reasonable trier of fact could conclude this criterion weighed in favor of transfer.

E.    *Circumstances and Gravity of the Charged Offense*

When evaluating the circumstances and gravity of the charged offenses, the court "shall give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development."[4] (§ 707, subd. (a)(3)(E)(ii).) The court found this criterion weighed in favor of transfer, explaining attempted murder is "one of the most serious offenses" and, here, it was alleged to have been "singularly committed by [Esteban] without provocation."

Esteban asserts the court "refused to consider [his] age, childhood trauma, or adolescence brain development as mitigating factors." But the court considered Esteban's "mental state and his mental and emotional development," to include Esteban's "own trauma and anxiety, while also experiencing adolescence and continued brain development." The court did not refuse to consider these factors, it simply disagreed they mitigated the circumstances and gravity of the offense because "the offense was a willful

---

[4]    If the evidence indicates the victim trafficked, sexually abused, or sexually battered the minor, the court should also consider that evidence. (§ 707, subd. (a)(3)(E)(iii).) No such evidence exists in this case.

19

premeditated shooting, it was not an impulsive act[,] and it was committed without provocation."

We conclude substantial evidence supports the court's finding on this criterion. As the court explained, Esteban waited outside the party for the victim and shot him five times at close range. The "victim suffered gunshot wounds to his chest, abdomen, and hands." Esteban shot the victim, without provocation, in order to "earn[ ]" a gang tattoo. His own statements revealed he hoped the victim died. The victim experienced significant trauma, requiring several urgent surgeries and intensive care. After the shooting, Esteban tormented the victim's family and bragged about what he did. He caused the victim physical and emotional harm, and the victim's family emotional and financial harm.

F.    *Conclusion*

In sum, considering each of the five criterion and viewing the record as a whole, we conclude there is substantial evidence from which a reasonable trier of fact could make the ultimate finding, concluding by clear and convincing evidence, that Esteban was not amenable to rehabilitation while under the jurisdiction of the juvenile court. While the court's order did not mention the SYTF program by name in its ruling, we reject Esteban's assertion this means the court "did not meaningfully consider" the facility as an option. The court reviewed the transfer report prepared by probation, which specifically focused on the potential for rehabilitation at a SYTF or HOPE program. And the defense expert's opinion that Esteban could be amenable to rehabilitation in the juvenile court system was directly tethered to her opinion that he could benefit from the services offered at a SYTF.

20

## DISPOSITION

The court's order is affirmed.

DO, J.

WE CONCUR:

IRION, Acting P. J.

RUBIN, J.